NOT DESIGNATED FOR PUBLICATION

No. 115,812

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellant/Cross-appellee*,

v.

HERSHEL A. KEMP,
*Appellee/Cross-appellant*.

MEMORANDUM OPINION

Appeal from Lyon District Court; JEFFRY J. LARSON, judge. Opinion filed February 2, 2018. Affirmed in part, reversed in part, and remanded with directions.

*Amy L. Aranda* and *Laura L. Miser*, assistant county attorneys, *Marc Goodman*, county attorney, and *Derek Schmidt*, attorney general, for appellant/cross-appellee.

*Patrick H. Dunn*, of Kansas Appellate Defender Office, for appellee/cross-appellant.

Before ATCHESON, P.J., BUSER, J., and BURGESS, S.J.

PER CURIAM: A jury sitting in Lyon County District Court convicted Defendant Hershel A. Kemp of committing multiple sex crimes, including several off-grid felonies, against K.R., his wife's minor daughter. Kemp has appealed, claiming numerous errors in the eight-day trial. Although Kemp received something short of a perfect trial, we find he received a fair trial, and the law requires no more than that. See *State v. Cruz*, 297 Kan. 1048, 1075, 307 P.3d 199 (2013) ("As we have recognized for decades, '[a] defendant is

1

entitled to a *fair* trial but not a perfect one[.]'") (quoting *State v. Bly*, 215 Kan. 168, 178, 523 P.2d 397 [1974]).

After the trial, the district court set aside guilty verdicts on three counts of rape because they may not have reflected unanimous agreement of the jurors on the specific criminal acts supporting them and imposed a series of life sentences and terms of imprisonment on the remaining convictions. The State has appealed the ruling on those rape verdicts. Under the factual circumstances, which essentially pitted the credibility of K.R. against the credibility of Kemp, we find the unanimity problem to have been harmless error.

We, therefore, affirm the convictions on which the district court sentenced Kemp. Kemp has not separately challenged the sentences, so we also affirm the judgment. We reverse the district court's ruling granting Kemp a new trial on the three rape convictions and remand with directions that those guilty verdicts be reinstated and Kemp be sentenced on them.

FACTUAL AND PROCEDURAL HISTORY

Kemp was born and raised in Detroit, Michigan. He traveled to Wichita, Kansas, in May 2010 on a bus that stopped in Emporia. Wanda T. was waiting for a friend to arrive by bus, and she entered into a conversation with Kemp. The resulting relationship led Kemp to move to Emporia to live with Wanda about a week after they met. At the time, Wanda had three children from a prior relationship, including K.R., who was born on February 3, 2004. When Kemp first moved in with Wanda, the children were living with relatives.

Kemp and Wanda changed residences frequently during their relationship. When Wanda became pregnant with the first of two children she would have with Kemp, they

2

brought her other children to live with them. Kemp and Wanda married on October 15, 2011. Just before the birth of their second child, Kemp an d Wanda moved into a house in Emporia. Wanda's father also lived there with the family.

Kemp did not hold a traditional job. He received Social Security disability benefits and occasionally played drums with local bands. During the early stages of their relationship, Wanda did not work, so they lived primarily on Kemp's disability payments. In November 2011, Wanda began working a series of jobs that often included evening and night hours. When Wanda was at work or sleeping and the children were not at school, Kemp supervised them.

On November 26, 2014, K.R. and her older brother were walking home with Wanda from a medical appointment. K.R. disclosed to Wanda that Kemp had come into her room and talked about the private parts of the male and female anatomy. He allegedly showed her pornography on his tablet and explained that she had a hole where he could put his penis. When Wanda asked whether Kemp had touched her inappropriately, K.R. denied that he had touched her.

They returned to the house, and Wanda contacted her brother, who listened to K.R.'s allegations and asked her questions. K.R. reported that Kemp had told her about another girl in Detroit. Kemp told K.R. that this other girl was in his "secret club" and that this girl had engaged in sexual intercourse with him. When relating her encounter with Kemp to her uncle, K.R. again denied that he had touched her inappropriately. Wanda's brother confronted Kemp. The conversation became heated, and Kemp denied the allegations. Wanda's brother asked K.R. to repeat her allegations in front of Kemp, but Kemp interrupted K.R. with outbursts, preventing her from relating the allegations. Kemp announced that he could not stay in the house with a child lying about him. Kemp packed some of his things and left the residence.

The day after Thanksgiving, Wanda and K.R. went to the Emporia police department to file a report. K.R. reported the conversation Kemp allegedly had with her about private parts, adding that Kemp explained to K.R. that his private parts shoot out "white stuff like eggs." When K.R. indicated that her mother would not approve of these conversations, Kemp told her that he would stop giving her preferential treatment in relation to her brothers. K.R. also repeated that Kemp had told her about another girl in Detroit with whom he had sexual relations. When the police officer taking the report asked K.R. if Kemp had touched her inappropriately, K.R. again said that he had not. Wanda told the officer that Kemp had previously cheated on her with underage girls. Wanda was initially reluctant to provide the names of these girls to the police, but, when the police informed Wanda that K.R.'s allegations did not support criminal charges, Wanda told the officer that she could provide the names of the underage girls with whom Kemp had engaged in extramarital affairs. The names she provided ultimately proved to be women over the age of consent.

On December 4, 2014, Kemp returned to the residence to collect more of his belongings. He got into a fight with Wanda, who was then arrested as the instigator of the domestic violence. The next day, Wanda filed a petition for protection from abuse (PFA), alleging the inappropriate conversations Kemp had with K.R. and that Kemp had touched K.R.'s buttocks. The court granted a temporary PFA order.

On December 8, 2014, Emporia Police Detective David Holmes interviewed Wanda at her home. Wanda repeated K.R.'s allegations and told the detective that Kemp had engaged in improper conversations with K.R. about 10 times. Wanda told the detective that she and her brother had continued to question K.R. about her interactions with Kemp because they felt she was withholding something. Holmes told them to stop questioning K.R. and scheduled an interview of K.R. at the Child Advocacy Center (CAC).

4

The following day, Kemp met with Holmes in an attempt to clear up the allegations supporting the PFA order so he could see the children. Kemp provided Holmes with printouts of Facebook pages containing threats from Wanda. When Holmes asked Kemp about K.R.'s allegations regarding a 10-year-old child in Detroit, Kemp denied living with anyone who had kids in Detroit. Kemp denied making any inappropriate comments to K.R. and suggested that Wanda was prompting K.R. to make the allegations.

On December 11, 2014, a friend drove Wanda and K.R. to the CAC for an interview with Kayla Delgado, a forensic interviewer with the Department for Children and Families. During this interview, K.R. reported that Kemp had engaged in extensive sexual activity with her since she was eight years old. The sexual activity progressed from oral sodomy to sexual intercourse, the last incident occurring two days before Thanksgiving 2014. After the interview, Delgado and Holmes met with Wanda and told her that Kemp's interactions with K.R. were more serious than K.R. had originally led her to believe and emphasized the need for a medical examination.

Based on the specific information K.R. disclosed in this interview, Holmes and another detective went to Kemp's residence and asked him to return to the police department for another interview. The detectives asked Kemp to bring his cell phone and laptop. During the interview, Holmes told Kemp that K.R.'s allegations now extended beyond inappropriate conversations to inappropriate sexual contact. Kemp denied the allegations, again stating that he believed Wanda had prompted K.R. to make the allegations. At the end of the interview, Holmes arrested Kemp for rape.

Following Kemp's interview, the police went to Wanda's residence and asked for permission to search the residence for physical evidence to corroborate K.R.'s account. Using an alternative light source, the detectives found stains in the carpet of the upstairs bedroom indicating the presence of prostate specific antigens (PSA). The bedroom was

5

shared by K.R. and her younger sister. Wanda and Kemp had previously used the bedroom but provided conflicting reports about whether they had sex in that bedroom. The detectives cut a portion of the carpet that contained the stains and ultimately submitted the carpet to the Kansas Bureau of Investigation for DNA testing against known DNA samples from K.R. and Kemp. The testing indicated the presence of DNA consistent with Kemp's known DNA as well as other unidentified DNA.

On December 12, Wanda took K.R. to the hospital for a medical examination. K.R. reported that her stepfather had been having sex with her until just before Thanksgiving. The nurse examiner discovered no observable external injuries but was not qualified to conduct an internal examination.

The police seized Kemp's laptops and cell phones and searched his devices, e-mail accounts, and cloud storage. They found no videos of Kemp and K.R. engaged in sexual activity. Kemp's phone and laptop had been recently overwritten to erase personal information. Kemp had sold his phone for well under its value ostensibly because he could no longer afford the charges on the phone and needed some cash.

On December 15, 2014, Wanda gave Detective Holmes K.R.'s diary and some of K.R.'s clothing that K.R. believed might have Kemp's semen on it. No material forensic evidence was found on the clothing. Some pages apparently torn from the diary contained an entry stating, "Hershel has been sexually abusing me and I don't like it." K.R. had written and then scribbled out some entries in her diary.

The State originally charged Kemp with aggravated indecent solicitation of a child, aggravated criminal sodomy, aggravated indecent liberties with a child, four counts of rape, promoting obscenity to a minor, and sexual exploitation of a child. The complaint was later amended to change the dates of some of the offenses. On January 12,

6

2015, the district court bound Kemp over for trial on all counts of the amended complaint.

Kemp's appointed lawyers filed pretrial motions to prevent an expert from testifying that K.R.'s behavior in the disclosure of the alleged abuse was consistent with the way sexual abuse victims commonly report what has happened to them, to prohibit the State's use at trial of other crimes evidence, under K.S.A. 2016 Supp. 60-455; and to exclude K.R.'s testimony and pretrial statements as impermissibly tainted by improper interview techniques. After a hearing on June 24, 2015, the district court ruled that Nichole Crump qualified as an expert witness for sexual assault examinations and findings related to the present case. The court also held that Kayla Delgado could testify about her interview with K.R. and as an expert regarding delayed reporting in alleged victims of sexual assault. The court permitted the State to introduce K.S.A. 60-455 evidence of H.K.'s allegations against Kemp in Detroit. The court postponed a ruling on the admissibility of K.R.'s testimony as impermissibly tainted until another hearing scheduled for August 20, 2015. Eventually, Kemp withdrew his objection to K.R.'s testimony.

The jury trial began on February 16 and ended on February 25, 2016. At trial, K.R. testified about the repeated sexual episodes with Kemp. In the main, K.R. testified consistently with what she had said in the CAC interview. According to K.R., Kemp referred to the sexual activity as "secret," and encouraged K.R. to engage in the sexual activity he requested by telling her of a 10-year-old girl in Detroit that he did "secret" with and that the girl's mother knew about it and didn't care. Kemp would also entice K.R. with special privileges that her brothers did not receive if she engaged in "secret" with him.

Before engaging in sexual activity with K.R., Kemp would send her brothers and younger sister to "lockdown," which meant that the children would go to their rooms to

7

stay until he allowed them to come out. K.R. alleged that Kemp showed her pornographic videos of people engaging in sex and that Kemp recorded some of their "secret" activity on his tablet and showed her the videos before deleting them. She alleged that Kemp made her fellate him and would slide his penis on her buttocks. K.R. testified in some detail about circumstances in which Kemp ejaculated during the incidents. She told the jurors Kemp explained that the semen contained eggs that could make her pregnant if it got inside her.

K.R. testified that much later Kemp began touching her vagina with his penis and then penetrated her vaginally with his fingers and penis. K.R. provided the jurors with detailed physical descriptions of those sex acts that we need not recount here. According to K.R., Kemp repeatedly had sexual intercourse with her and ejaculated in her at least one time. The last time Kemp had sexual intercourse with K.R. was two days before Thanksgiving, after which she told him that she no longer wanted to do "secret." Kemp told K.R. that it was okay but that she would no longer get special privileges. Kemp cautioned her not to tell anyone about what they had done.

In addition to K.R.'s testimony, the State presented trial evidence that Kemp had sexually abused H.K., a girl who lived in Detroit, and Kemp had asked A.R.-H., another girl in Emporia, sexually provocative questions and had invited her to join his "secret club." K.R.'s brothers, L.R. and A.R., testified about K.R.'s exemption from lockdown and about K.R.'s appearance after lockdown. Both boys testified that K.R. sometimes emerged from their mother's room after lockdown. A.R. recalled that he came out of his room during lockdown once and K.R. and Kemp were inside his mother's bedroom with the door shut. K.R. was crying out. When K.R. came out of the bedroom, A.R. noticed that her hair was messy, and Kemp was not wearing a shirt.

Kemp testified in his own defense and generally denied the allegations. He told the jurors Wanda was the driving force behind the allegations against him because she was

8

angry about his infidelity. Wanda's father testified that he had lived with Kemp, Wanda, and the children during much of the relevant time and never saw any improper interactions between Kemp and any of the children.

The jury convicted Kemp of all counts the State presented at trial. Through his lawyer, Kemp made several motions for a judgment of acquittal and filed a written motion for a new trial based on newly discovered evidence. The district court considered the defense motions at the sentencing hearing on April 13, 2016. The district court construed the motions as including requests for a new trial and set aside three of the four verdicts finding Kemp guilty of raping K.R. on different occasions for lack of jury unanimity because the State neither requested a specific unanimity instruction nor identified in closing argument the specific sexual incidents corresponding to those rape counts. The district court denied the motion for a new trial based on newly discovered evidence.

The district court sentenced Kemp to four consecutive life sentences with parole eligibility after serving 25 years on each for the verdicts convicting him of aggravated criminal sodomy, aggravated indecent liberties with a child, sexual exploitation of a child, and rape. The district court imposed concurrent terms of incarceration for the convictions of aggravated indecent solicitation of a child, a felony, and of promoting obscenity to a minor, a misdemeanor, for a term of 51 months, consecutive to the life sentences. As we have outlined, Kemp appealed the convictions on which he was sentenced. And the State has appealed the district court's ruling granting Kemp a new trial on three of the rape convictions.

KEMP'S APPELLATE ISSUES CONSIDERED AND DECIDED

*Testimony from the State's Proffered Computer Expert*

Kemp first challenges the district court's decision to permit Shaun Price, a detective with the Wichita Police Department, to testify as an expert regarding the evidence he discovered through a forensic examination of Kemp's laptop computer. The admission of expert testimony, like other evidence, is primarily governed by statute. See K.S.A. 2016 Supp. 60-456; 60-458. The Kansas statutes governing the admission of expert testimony now essentially mirror Federal Rules of Evidence 702 and 703. Cases construing and applying the federal rules provide persuasive authority for the application of K.S.A. 2016 Supp. 60-456. See *Smart v. BNSF Railway Co.*, 52 Kan. App. 2d 486, 494, 369 P.3d 966 (2016); *In re Care & Treatment of Quary*, 50 Kan. App. 2d 296, 298-99, 324 P.3d 331 (2014) (federal law persuasive in applying K.S.A. 59-29a06[c], mirroring F.R.E. 703 and present version of K.S.A. 60-458 governing sources of information on which expert witness may rely).

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), the United States Supreme Court established the general framework for admitting expert testimony under Rule 702. The district court bears the responsibility of determining the admissibility of expert testimony. "This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93; see also *United States v. Chapman*, 839 F.3d 1232, 1237 (10th Cir. 2016) ("Rule 702 requires the district court, before admitting expert testimony, to ensure that testimony 1) has 'a reliable basis in the knowledge and experience of [the expert's] discipline,' and 2) is 'relevant to the task at hand.'"). Those requirements are similarly captured in K.S.A. 2016 Supp. 60-456(b).

Appellate review of a challenge to the admission of expert testimony has two components. Whether the district court has appropriately exercised its gatekeeping function is a question of law, subject to unlimited appellate review. Once the appellate court determines that the district court properly applied the correct legal framework, however, the decision to admit or exclude the expert testimony is reviewed for an abuse of discretion. *Smart*, 52 Kan. App. 2d at 493; *United States v. Young*, 316 F.3d 649, 656 (7th Cir. 2002). Judicial discretion is abused when the court's decision is based upon an error of law, based upon unsupported facts, or otherwise arbitrary, fanciful, or unreasonable such that no reasonable person in the position of the district court would have ruled similarly. *State v. Williams*, 303 Kan. 585, 595-96, 363 P.3d 1101 (2016). The party asserting an abuse of judicial discretion bears the burden of establishing it on appeal. See *State v. Robinson*, 303 Kan. 11, 90, 363 P.3d 875 (2015), *cert. denied* 137 S. Ct. 164 (2016).

The first requirement of any expert testimony is qualification of the witness by education, training, or experience to render an opinion. See K.S.A. 2016 Supp. 60-456(b); *Smart*, 52 Kan. App. 2d at 494. To determine whether Price was qualified to render an opinion, the court must ascertain the opinions sought to be offered. In the present case, the State sought to offer three opinions through Price's testimony. First, the State sought to present Price's opinion regarding the contents of Kemp's computer. Searching a computer for data involves specialized knowledge beyond the common knowledge of a layperson. The State elicited Price's qualifications as a forensic computer investigator, and, on appeal, Kemp does not challenge Price's qualifications to examine and mine data from the computer.

Second, the State sought to elicit an opinion about Pro PC Cleaner, a program found on Kemp's computer that apparently is used to erase data and could be at least indirectly incriminating. Price testified that he had no personal knowledge about Pro PC Cleaner. He, therefore, could not be qualified as an expert regarding the function or

11

purpose of the program. The district court ruled that Price could not testify about the "specifics as to what Pro PC Cleaner does."

Price, however, testified that he discussed the program with other investigators on a listserv maintained by the International Association of Criminal Investigative Specialists. He also represented that forensic investigators commonly use the listserv to obtain information about computer programs with which they have no personal familiarity. In our view, the district court incorrectly permitted Price to identify Pro PC Cleaner as a program designed to wipe data from the computer and, in turn, to describe generally how such programs can be used to delete data, including electronic images, from a computer's memory.

Basically, Price simply "asked around" to determine what kind of program Pro PC Cleaner might be. We don't know who is permitted to communicate on the listserv or from whom Price specifically got his information. Those people conceivably might be experts on Pro PC Cleaner, but that didn't make Price one just for having communicated with them. Had Price downloaded a user manual for Pro PC Cleaner or acquired a copy of the program and actually worked with it, he likely had the training and experience to become a self-taught expert about its attributes through that research. He didn't do that. Price should not have been permitted to testify to the general purpose of Pro PC Cleaner.

In turn, the State did not offer competent evidence to show that Kemp had a program on his computer designed to erase data. The district court, therefore, should not have allowed Price to testify in general about those sorts of programs, what they do, and how they work—the third opinion he presented at trial. Without a proper showing that Kemp used such a program, the general testimony simply presented abstract, if specialized, information that lacked a connection to the admissible facts. Such factually unmoored expert testimony is itself inadmissible. See K.S.A. 2016 Supp. 60-456(b)(3) (expert testimony admissible if witness "has reliably applied the principles and methods

12

to the facts of the case"); *State v. Wilmer*, No. 115,879, 2017 WL 6625556, *2 (Kan. App. 2017) (unpublished opinion) (The district court erroneously admitted testimony from an otherwise qualified expert on domestic violence because "what she had to say was simply a collection of free-floating concepts wholly unconnected to the factual circumstances presented to the jury."). In short, the district court erred.

The erroneous admission of evidence as part of the State's case does not, however, necessarily require reversal of a jury's guilty verdicts. The error may be harmless in any given trial. See *State v. Torres*, 294 Kan. 135, 143, 273 P.3d 729 (2012). Because the admission of Price's expert testimony did not compromise Kemp's constitutional rights (and he doesn't claim it did), we determine harmlessness by asking if we are convinced there is no reasonable probability the error affected the verdicts. See *State v. McCullough*, 293 Kan. 970, 983, 270 P.3d 1142 (2012).

The prejudice arising from Price's testimony is minimal. Since Price found no incriminating evidence on the laptop, the evidence about the existence of a cleaner program essentially creates an inference that Kemp may have eliminated incriminating data from his computer before turning it over to the police. But Kemp might have used the program only to erase financial data or medical information unrelated to the charges in this case. Kemp's trial lawyer posed that possibility to the jurors during closing arguments.

As we have indicated and as we will repeat, this case ultimately rested on a rather direct credibility contest between K.R. and Kemp, both of whom testified during the trial. Sorting out testimonial inconsistencies and evaluating witness credibility is a function uniquely entrusted to jurors. And "[t]he judicial process treats an appearance on the witness stand, with the taking of an oath and the rigor of cross-examination, as perhaps the most discerning crucible for separating honesty and accuracy from mendacity and misstatement." *State v. Bellinger*, 47 Kan. App. 2d 776, 787, 278 P.3d 975 (2012), *rev.*

13

*denied* 298 Kan. 1204 (2013) (Atcheson, J., dissenting). The ability of the jurors to observe witnesses as they testify is integral to that evaluation. *State v. Scaife*, 286 Kan. 614, 624, 186 P.3d 755 (2008). Here, the jury resolved that foundational issue in favor of K.R. Price's testimony about Pro PC Cleaner and the purpose of similar computer programs didn't bring about that result or significantly shift the tide in that direction. Although K.R. testified that Kemp recorded some of his sexual conduct with her and Price found no such images on the computer or Kemp's cell phone, that isn't especially telling. K.R. simply could have been mistaken about the electronic device Kemp used to record or store those images. Other evidence also tended to corroborate K.R.'s account.

Under the circumstances, the evidentiary error in admitting Price's testimony had no reasonable probability of affecting the outcome of the trial.

*Prosecutor's Question about H.K.'s Motives*

Kemp contends the prosecutor committed reversible error during the trial by asking him what motive H.K. had to accuse him of sexually molesting her years earlier in Detroit. H.K. testified against Kemp and described a pattern of sexual abuse similar to what K.R. asserted Kemp did to her.

While cross-examining Kemp, the prosecutor asked, "What was [H.K.]'s motive?" Kemp's trial lawyer interposed an objection on the grounds the question called for speculation. The district court overruled the objection. Kemp responded: "I'm sorry, I don't know how to answer that." In his direct examination, Kemp told the jury that he had an acrimonious breakup with H.K.'s mother and believed she had induced H.K. to make false accusations against him to get even. In that respect, Kemp had already suggested a reason or motive for H.K. to have said he sexually abused her—to accede to a request or demand from her vengeful mother.

14

On appeal, Kemp shifts his focus from the speculative nature of the question to its argumentative character in purportedly soliciting an assessment or opinion about H.K.'s credibility. See *State v. Crum*, 286 Kan. 145, 151-52, 184 P.3d 222 (2008). We are confined to reviewing the challenged question based on the objection lodged during trial and cannot expand the challenge in the guise of considering "prosecutorial error." K.S.A. 60-404 (codifying contemporaneous objection rule); *State v. Dupree*, 304 Kan. 43, 62, 371 P.3d 862 (appellate review confined to contemporaneous trial objection), *cert. denied* 137 S. Ct. 310 (2016); *State v. King*, 288 Kan. 333, 349, 204 P.3d 585 (2009) (appellate court will not consider appropriateness of State's question as prosecutorial error in absence of trial objection).

The general rule prohibiting a party from asking one witness to offer an opinion about the credibility of another witness has typically been applied when the two witnesses offer conflicting accounts of some historical fact bearing on the disputed issues. On cross-examination of the witness offering the account conflicting with the earlier witness' version, a lawyer often would attempt to impeach by pointing out the discrepancy and then asking why the first witness would lie. And more particularly, the scenario would often play out in a prosecutor's cross-examination of a criminal defendant when the defendant had testified to a version of events differing from what a witness said during the State's case in chief. In that context, a "liar-liar" question is objectionable on multiple grounds. It is argumentative in the sense that it presupposes one of the witnesses must be lying rather than being honestly mistaken. For the same reason, it assumes a fact not in evidence—that the first witness may be lying. If the second witness has not otherwise addressed the apparent conflict in testimony, the question likely would be beyond the scope of the direct examination and would seem to invite speculation or an impermissible opinion.

But those concerns are greatly diminished or alleviated when the second witness in his or her direct examination explicitly testifies that events the first witness has described

15

never happened and the events are of a sort that wouldn't commonly be forgotten or mistaken. H.K.'s testimony is a good illustration. H.K. testified Kemp, who she otherwise knew, sexually abused her on multiple occasions—a victim of those sorts of crimes typically would not be mistaken about the nature of the incidents or the perpetrator. (We make allowance for some extraordinarily rare scenario in which the putative victim was sufficiently delusional to have imaged the episodes or confused benign conduct with sexual abuse, while genuinely believing those delusions. But generally applied legal rules and doctrine are not necessarily shaped to account for extraordinary rarities, since that would likely erode their usefulness in the overwhelming majority of cases. Those rarities invite narrow or even ad hoc exceptions to general rules and doctrines.) So Kemp's direct testimony that the events never happened necessarily impugned H.K.'s veracity. And his explanation for the reasons behind H.K.'s accusations, also given on direct examination, only intensified his hardly veiled implication that H.K. lied about him. In that circumstance, Kemp's direct examination opened up the very issue of H.K.'s honesty and, in turn, her motives in a way that simply offering conflicting accounts of the same events does not. In short, here, the prosecutor's question may well have been proper. But we will look at Kemp's challenge of prosecutorial error based on his trial objection of speculation.

To assess impropriety in a prosecutor's closing argument, the Kansas appellate courts now deploy the analytical model initially outlined in *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016), that first considers "error" and then weighs any "prejudice" to the defendant resulting from an error. The *Sherman* test has since been applied to a prosecutor's questioning of a witness during trial. See *State v. Kleypas*, 305 Kan. 224, 323-24, 382 P.3d 373 (2016), *cert. denied* 137 S. Ct. 1381 (2017).

We assume a question will be considered erroneous under *Sherman* should it fall outside the latitude commonly afforded lawyers in framing inquiries consistent with the law, including the rules of evidence. See *State v. Carter*, 305 Kan. 139, 148, 380 P.3d

16

189 (2016) (*Sherman* error may arise from prosecutor's negligence or carelessness, on the one hand, or intentional or malicious conduct, on the other). If an appellate court finds the challenged question to be prosecutorial error, it presumably must then consider prejudice measured by the test set out in *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011), for constitutional error. The State, as the party benefiting from the error, must demonstrate "'beyond a reasonable doubt'" that the mistake "'did not affect the outcome of the trial'" taking account of the full trial record. *Sherman*, 305 Kan. at 109 (quoting *Ward*, 292 Kan. 541, Syl. ¶ 6); see *Kleypas*, 305 Kan. at 323 (applying *Sherman* test for prejudice to prosecutor's question during penalty phase of capital case). That is, the appellate court must determine if the error deprived the defendant of a fair trial—a constitutional protection rooted both in due process and in the right to trial itself. *Sherman*, 305 Kan. at 98-99, 109. We understand Kemp to be making that sort of argument here: He was deprived of a fair trial based on the prosecutor's question itself rather than the answer he gave after the district court overruled the objection. 305 Kan. 88, Syl. ¶ 5 ("Whenever a claim is asserted that any act of a prosecutor has denied a criminal defendant his or her due process rights to a fair trial, we will refer to the claim and resulting judicial inquiry as a claim of 'prosecutorial error.'").

A different calculus might be required if the defendant alleged prejudice principally from the content of the answer itself. That argument would be based on the wrongful admission of evidence resulting from the district court's error in overruling the objection combined with the prosecutor's error in asking the offending question. We suppose the nonconstitutional standard for harmlessness also drawn from *Ward* would apply in that situation. See 305 Kan. 88, Syl. ¶ 9 (statutory harmlessness test may be applicable to prosecutorial error). We needn't delve into that possibility further.

We assess the challenged question using the constitutional test for prosecutorial error, thereby affording Kemp the more favorable standard, and readily conclude it could have had no discernible impact on the jury's verdicts. The question was posed amidst an

17

eight-day trial and didn't tread on a highly prejudicial subject, the mere mention of which could be destructive of a fair trial. To the extent the question was improper, it was only technically so. First, in the abstract, the question does invite speculation. But the question could have been rephrased to avoid that problem: "Are you aware of any reason H.K. would say those things about you if they didn't happen?" Second, and more importantly, as we have discussed, Kemp testified during his direct examination about H.K.'s credibility and offered a reason she might lie. He, then, opened up the subject, so the prosecutor fairly explored it on cross-examination, albeit with an inadroitly phrased question. Any resulting error was insignificant.

*Admission of Other Crimes Evidence Under K.S.A. 2016 Supp. 60-455*

Kemp contends the district court impermissibly allowed H.K. to testify about how he purportedly sexually abused her when he lived in Detroit and had an ongoing relationship with her mother. The district court admitted H.K.'s testimony and related evidence under K.S.A. 2016 Supp. 60-455(d), which, in pertinent part, provides:

> "(d) Except as provided in K.S.A. 60-445, and amendments thereto, in a criminal action in which the defendant is accused of a sex offense . . . evidence of the defendant's commission of another act or offense of sexual misconduct is admissible, and may be considered for its bearing on any matter to which it is relevant and probative."

The conduct H.K. attributed to Kemp falls within subsection (d) and, therefore, could be admitted as evidence of his propensities and, in turn, to prove he acted on those propensities to sexually abuse K.R. *State v. Smith*, 299 Kan. 962, 970, 327 P.3d 441 (2014).

Under the exception in K.S.A. 60-445, a district court may exclude such propensity evidence if its probative value is substantially outweighed by its undue

18

prejudice to the defendant. *State v. Huddleston*, 298 Kan. 941, 961-62, 318 P.3d 140 (2014). A district court's ruling weighing probative value against undue prejudice will be reviewed on appeal for abuse of judicial discretion. *State v. Wilson*, 295 Kan. 605, Syl. ¶ 1, 289 P.3d 1082 (2012). We have already outlined the standard of appellate review for a matter entrusted to the district court's exercise of discretion. See *Williams*, 303 Kan. at 595-96

Kemp first argues that the incidents alleged by H.K. should have been excluded as evidence because they were not strikingly similar to the incidents alleged by K.R. Crimes that are so strikingly similar in their particulars as to reflect something approaching a unique signature of the perpetrator may be introduced to prove identity. For example, if Defendant A is reliably known to commit burglaries of high-end jewelry stores using specific and highly unusual methods, that evidence may be admitted to show Defendant A burglarized the Acme Jewelry Emporium because the crime displayed those methods. Here, of course, Kemp's identity is not at issue. If H.K. and K.R. are telling the truth, then Kemp sexually abused them. Given the circumstances of the abuse, they would not be mistaken about the perpetrator.

Propensity entails a disposition or proclivity to engage in a defined activity. Accordingly, to be admitted as propensity evidence under K.S.A. 2016 Supp. 60-455(d), an instance of conduct need only be sufficiently similar to the charged crime to display a common disposition or proclivity. Here, for Kemp, that would be a propensity to engage in sexual intercourse, oral sex, and like activities with prepubescent girls. To that extent, H.K.'s testimony was admissible.

Kemp also argues that H.K.'s testimony and the related evidence was more unduly prejudicial than probative and should have been excluded for that reason regardless of any relevance it might have. He again suggests the lack of similarity as a reason to exclude the evidence about H.K. We find that aspect of the argument unpersuasive in that

19

the conduct ascribed to Kemp in sexually abusing H.K. reflected the same propensities as the conduct K.R. recounted.

H.K.'s testimony was highly prejudicial in the sense of advancing the State's case against Kemp. If the jurors believed H.K., they could readily conclude that Kemp repeated that sort of behavior with K.R.—he did it before, so he must have done it again. But that kind of impact is not *unfair* prejudice, it reflects precisely what the Legislature intended to allow under K.S.A. 2016 Supp. 60-455(d).

Here, unfair prejudice arguably could arise because of the uncertainty surrounding H.K.'s accusations against Kemp. The record evidence indicates Kemp was never charged with or convicted of abusing H.K., even though law enforcement agencies were informed of those accusations. So while H.K.'s assertions and K.R.'s assertions corroborated each other, neither account had been independently proved in a judicial proceeding, and Kemp disputed both. See *State v. Bowen*, 299 Kan. 339, 350, 323 P.3d 853 (2014) (clarity of proof of bad acts offered as propensity evidence under K.S.A. 2010 Supp. 60-455[d] factor in weighing probative value versus undue prejudice); *United States v. LeMay*, 260 F.3d 1018, 1028-29 (9th Cir. 2001) (court may consider "extent to which an act has been proved," the lapse of time, and the frequency of such acts in weighing admissibility of sexual misconduct as propensity evidence under comparable federal law, including F.R.E. 414). The balancing in this case may have been closer than in many. We mention K.R. reported that Kemp had told her about a girl in Detroit who had participated in "secret" behavior with him as a way of inducing her participation in the acts charged in this case. K.R. offered that information before law enforcement authorities found H.K. The timing of K.R.'s representation on that point lends some support to H.K.'s account of her interactions with Kemp.

Given the applicable standard of review, we cannot say the district court abused its discretion in allowing H.K. to testify and admitting the related evidence. The district

20

court generally understood and applied the governing law to an accurate portrayal of the facts. We cannot conclude that no other district court would have admitted the evidence under K.S.A. 2016 Supp. 60-455(d).

*Det. Holmes' Testimony as Cumulative Evidence*

Kemp contends that Det. Holmes was impermissibly permitted to testify during the trial to the content of a detailed out-of-court account K.R. gave him describing the sexual abuse Kemp purportedly inflicted on her. Kemp's trial lawyer objected to the testimony. But other witnesses provided similar testimony about the substance of other out-of-court statements from K.R. relating what happened to her. Those witnesses testified without objection.

We assume for purposes of resolving the issue that Det. Holmes' challenged testimony was improperly cumulative and should not have been admitted for the jury's consideration. Even with that assumption, however, Kemp cannot demonstrate prejudicial error. The other witnesses provided comparable testimony that the jury appropriately could consider in the absence of contemporaneous objections. Det. Holmes' account simply added to what was already before the jury. Under the circumstances, that account would not amount to prejudicial, let alone reversible, error. See *State v. Sean*, 306 Kan. 963, 987, 399 P.3d 168 (2017) (harmless error in admitting testimony cumulative of other evidence properly received).

*State's Closing Argument*

On appeal, Kemp identifies what he characterizes as four errors in the prosecutor's closing argument to the jurors and contends they deprived him of a fair trial. We generally agree with the characterization but not the effect.

Kemp did not lodge contemporaneous objections to the closing argument. An objection, however, is not necessary to preserve appellate review of an improper jury argument. *State v. Roeder*, 300 Kan. 901, 932, 336 P.3d 831 (2014), *cert. denied* 135 S. Ct. 2316 (2015). We apply the framework for prosecutorial error from *Sherman* that we have already outlined.

• First, Kemp asserts that the prosecutor improperly bolstered H.K. by suggesting she came forward voluntarily to testify at the trial. The prosecutor told the jurors the State had no "magic" to secure H.K.'s testimony, thereby suggesting her account should be credited. The prosecutor specifically told the jurors:

> "And then six years later, she comes from Detroit to Kansas. She's been found and she comes here to tell you. Five and a half, six years later, what purpose or motive does she have not to tell you what happened to her? Detroit's not nearby. Detroit's far enough away that we don't have some magic to cause her to come here. She comes here."

The argument, however, mischaracterizes the law. In a criminal case, the prosecution may secure a subpoena or another order from a court in another state to compel the appearance of a material witness who resides in that state, if that state has also adopted the Uniform Act to Secure Attendance of Witnesses from Without a State. See K.S.A. 22-4203. Michigan has adopted the uniform act and, therefore, would reciprocate with Kansas in securing witnesses needed for criminal cases. See M.C.L.A. 767.92.

The appellate record does not immediately reveal whether a Michigan court issued an order compelling H.K. to appear at Kemp's trial. Even if no order were entered, the prosecution could have informed H.K. it would seek a subpoena if she otherwise refused to appear. Although a subpoena may not be "magic," it is a court order the violation of which may be punished as a contempt and, thus, may be coercively enforced.

At the very least, the prosecutor's argument fostered a misimpression that the State could have done nothing to require H.K. to testify and, in turn, she must have come forward simply and purely to tell the truth about what happened to her. H.K., of course, may very well have been telling the truth. The point here, however, is the propriety of the prosecutor's argument suggesting that could be the only possible reason H.K. appeared at trial. In making the argument, the prosecutor stepped outside the wide latitude afforded the State's lawyers in closing argument by at least implicitly misrepresenting the law governing the appearance of witnesses. That is prosecutorial error. *State v. Tahah*, 302 Kan. 783, 791, 358 P.3d 819 (2015) (prosecutor's misstatement of law in closing argument "constitutes error").

Having found prosecutorial error, we turn to the second step of the *Sherman* analysis to ask whether the error materially compromised Kemp's right to a fair trial. We must be convinced beyond a reasonable doubt the error did not affect the outcome, i.e., had no real influence in prompting the guilty verdicts. We are of that view. The jurors saw and heard H.K. testify and were able to assess her credibility from that vantage point using all of the tools at their disposal. As we have already said, those are considered especially powerful tools for sorting the credible from the unreliable. Accordingly, the prosecutor's closing argument about how H.K. came to the witness stand fades into the distant periphery compared to her comportment and the content of her testimony once there.

23

• Kemp contends that the prosecutor's argument about the feelings Wanda must have had as K.R. reluctantly told her of Kemp's conversations with her about male and female anatomy improperly aimed to gin up sympathy with the jurors. After Kemp's lawyer argued to the jurors that the evidence showed Wanda had orchestrated K.R.'s allegations of sexual abuse, the prosecutor responded, in part, this way:

"Wanda Kemp is walking down a street with two of her children right before Thanksgiving, and whether it's, Mom, I need to tell you something. What feeling of dread. It's like the phone call at 2 a.m. It's like the priest and the military officer outside your door when you have a son in Afghanistan. That brief feeling where you're going, Oh, I hope this isn't bad. And she gets upset over at that time the only piece of information she has is, he's talked to her about subjects she didn't want her daughter talked to. A ten year old has a sex talk."

In closing arguments, the lawyers must confine their representations to the admissible evidence presented during the trial and reasonable inferences drawn from that evidence. That has been characterized as a "fundamental rule." *State v. Ly*, 277 Kan. 386, 393, 85 P.3d 1200 (2004). A prosecutor's comments on the evidence should accurately reflect the evidence or the applicable law and should not be intended to inflame the jury's passions or prejudices or divert the jury from its duty to decide the case on the evidence and the law. See *State v. Anderson*, 294 Kan. 450, 463, 276 P.3d 200 (2012).

Wanda never testified to what she thought or felt as K.R. broached the subject of Kemp's sexual impropriety. In her testimony, Wanda described being upset because K.R. indicated that she wanted to say something and then shied away from doing so. The prosecutor's argument ventured outside the facts and traded on speculation rather than reasonable inference. Again, we have prosecutorial error.

But the argument is another one far from the central issues in the case. What Wanda may have thought at that point seems, at best, background of limited relevance to

24

whether Kemp sexually abused K.R. Even if the argument were taken as a pitch for sympathy for Wanda, the impact on the jurors' assessment of the central evidence seems remote. We cannot ascribe any tangible effect to the argument, given the evidence and the issues, in contrast to, say, a blatant appeal to the jurors' natural inclination to sympathize with K.R.

• Kemp's trial lawyer argued to the jurors that H.K. was unreliable because authorities in Michigan never filed any charges against Kemp based on her allegations. In rebuttal, the prosecutor told the jurors that Kemp still could be charged in Michigan. Nothing in the trial evidence supported the prosecutor's claim. There was no evidence that H.K.'s accusations remained under some sort of active investigation by a law enforcement agency. And there was no evidence as to the relevant Michigan statute of limitations. So the prosecutor's rejoinder necessarily ventured outside the evidence and was error for that reason.

This is another error of minimal import. The jurors were to assess H.K.'s credibility on the evidence before them, including her appearance on the witness stand. Just why some government agent in Michigan decided not to pursue criminal charges against Kemp is a peripheral consideration largely resting on the opinion of that agent. The decision may or may not have been one based on H.K.'s inherent credibility as much as a lack of corroborating evidence, especially measured against the required degree of proof necessary to convict. Those considerations fall outside the jurors' fact-finding function in this case. We have no reason to conclude the jurors relied on a tangential decision of Michigan authorities about prosecuting Kemp over their own studied assessment of H.K. and the other evidence actually admitted during the trial.

• Kemp challenges another part of the prosecutor's closing argument as an impermissible attack on his credibility. In rebuttal, the prosecutor argued:

25

"And if this vindictive attack has merit and he said all these people received all these emails from her trying to attack him and discredit him, where are they? There's no testimony here when he made the choice to take that stand, there's nothing here but him and illusions to a family dynamic that defies what the evidence should be. It is created after the fact to answer what he learns as he becomes aware of it.

"If any of these pieces are true, if any of them are something that is valid — validatable—I don't know if that's a word—why isn't it presented before? He presents everything after. He answers it after. He anticipates it after."

Kemp contends the argument entails the prosecutor's expression of a personal opinion that he and his testimony were not credible. A lawyer may not offer his or her own opinion about the credibility of a witness. *State v. Peppers*, 294 Kan. 377, 396, 276 P.3d 148 (2012). Rather, he or she may argue why, based on the evidence, jurors should believe or disbelieve a witness. *State v. Anthony*, 282 Kan. 201, 210, 145 P.3d 1 (2006).

The portion of the prosecutor's argument Kemp assails may suffer from several vices. It appears to suggest Kemp launched the idea that he was the victim of some grand conspiracy during or on the eve of trial. But he suggested the idea when law enforcement officers interviewed him before he was even charged. Beyond that, the argument suffers more from a lack of cogency than anything else. The argument, however, does not appear to be a direct or implicit personal comment on Kemp's credibility. We don't see a prosecutorial error of the sort Kemp ascribes.

Although we have recognized three instances of prosecutorial error in closing argument, none alone warrants relief. We have also reviewed them collectively to determine if, taken together, they rendered the argument sufficiently prejudicial to deny Kemp a fair trial. They did not. As we have explained, the errors dealt with peripheral matters that singularly and together were sufficiently removed from the controlling issues and relevant evidence that they would not have moved the jurors to convict.

26

*Denial of Mistrial Motions*

On appeal, Kemp complains the district court erred in denying three motions his trial lawyer made requesting a mistrial based on separate occurrences during the trial.

In evaluating a motion for mistrial, the district court must first decide if there is prejudicial conduct that results in a fundamental failure in the proceeding, which means that prejudice makes it impossible to proceed without injustice to either party. See K.S.A. 22-3423(1)(c). If there has been potentially prejudicial problem during the trial, the court must consider whether the damaging effect can be alleviated with a remedy less drastic than a mistrial, such as an admonition to the jury, a curative jury instruction, or some other action. If the harm cannot be cured or mitigated, the district court must determine whether the residual prejudice creates an injustice. If so, a mistrial should be declared. *State v. Moyer*, 302 Kan. 892, 906, 360 P.3d 384 (2015). As a general matter, a district court's ruling on a motion for a mistrial lies within its sound discretion. We review to determine if that discretion has been abused under the standard we have already outlined. 302 Kan. at 906.

• Emporia Police Officer Tera Titus testified that Wanda had said in an interview that Kemp had cheated on her with underage girls. Kemp's trial lawyer immediately objected and received a continuing objection to any such testimony. Officer Titus was the last witness of the day.

The next morning outside the presence of the jury, Kemp's lawyer moved for mistrial based upon improper K.S.A. 60-455 evidence and unfair surprise. In response, the State argued that the two women Wanda mentioned were investigated and determined to be over 16 years of age and that the names of the women were disclosed to the defense. The State's argument seems to miss the point of potential prejudice to Kemp,

27

especially since Wanda's statement was demonstrably false with respect to the age of the women.

The district court recognized the problem with Wanda's statement and Officer Titus' testimony. But the district court denied the motion for a mistrial, reasoning that the testimony amounted to a passing reference. The district court stated it would instruct the jurors to disregard Wanda's statement as recounted by Officer Titus. Kemp's trial lawyer did not object to that approach or the content of the instruction. When the jurors reconvened in the courtroom, the district court told them to "disregard the statement made by Officer Titus regarding the allegation that Mr. Kemp has had sex with other underage girls."

The district court understood Kemp's complaint about the testimony and the legal grounds for granting a mistrial. Under the circumstances, the district court provided an intermediate remedy by instructing the jurors to disregard Wanda's statement. Kemp did not take issue with the district court's alternative remedy. We assume the jurors adhered to the district court's instruction absent a contrary indication in the record. See *State v. Williams*, 299 Kan. 509, 560, 324 P.3d 1078 (2014) ("appellate courts presume that the jury followed the [district] court's admonition"). We decline to say no other district court would have denied the motion for a mistrial in a comparable situation in reliance on a less drastic remedy. The district court acted within its judicial discretion.

• During the State's case, Delgado testified about her interview of K.R., and the jurors watched a redacted video of the interview. While the video was playing, Kemp became noticeably upset. As the district court described the situation, Kemp "started crying and screaming." The district court stopped the video, sent the jurors out, and removed Kemp from the courtroom to calm down. Kemp's emotional cries could still be heard by the district court and the lawyers in the courtroom as they discussed how to proceed.

28

Kemp's trial lawyer asked for a mistrial on the ground the outburst during the videotaped interview of K.R. so "tainted" the proceedings that jurors could no longer fairly decide the case. Before ruling on the oral motion for a mistrial, the district court dismissed the jurors for the day. The record does not specifically indicate the time the jurors were excused other than it was in the afternoon. Kemp had returned to the courtroom then. So far as the record indicates, he was emotionally composed, and he responded appropriately, if briefly, to several questions from the district court.

The next morning when the jurors reconvened in the courtroom, the district court reminded them of the oath they took at the start of the case "to render a fair and impartial verdict." Without specifically referring to the uproar the preceding afternoon, the district court asked the jurors collectively to raise their hands if they believed they could "still uphold that oath." The district court stated that all of the jurors and the alternate jurors raised their hands. The district court then simply denied the defense motion without more specifically identifying its nature in the presence of the jurors. Kemp's lawyer lodged no objection to the district court's inquiry of the jurors.

Here, again, the district court was aware of the potential problem Kemp's emotional meltdown posed and took remedial steps to determine the potential impact on the jurors without unduly highlighting the situation. The district court initially considered questioning the jurors individually and discarded that approach in favor of a much briefer and more generic inquiry. The district court plainly understood the factual circumstances and the governing law. We, again, conclude the district court ruled well within the acceptable range of judicial discretion.

This sort of situation presents a considerable challenge for a district court in the midst of a jury trial. Although the record in this case strongly indicates Kemp was genuinely overwrought, a mistrial typically should be deployed especially sparingly in

29

response to a defendant's conduct in front of a jury. To do otherwise would invite a defendant to engage in histrionics or other deliberately provocative actions to secure a mistrial. Those efforts presumably would be unsuccessful in the main, since the defendant would be attempting to deliberately sabotage his or her own trial. See *United States v. Rodriguez-Velez*, 597 F.3d 32, 43 (1st Cir. 2010).

• During the trial, Det. Price testified about a cell phone that Kemp had owned and later sold. Det. Price made a forensic examination of the cell phone and told the jurors that cell phone had been reset to the original default options, eliminating any stored data, and that the SIM card had been removed, limiting its use. The prosecutor then asked Det. Price about the characteristics of "rooted" cell phones. Kemp's lawyer objected as Det. Price began his answer. The district court sustained the objection. Det. Price testified he didn't know if Kemp's phone was rooted. The prosecutor then asked Det. Price about the developer options on the phone; Kemp's lawyer again objected and ultimately moved for a mistrial.

The district court denied the motion and appeared to find the line of questions and the limited answers did not cause a fundamental failure in the proceedings. The district court found Det. Price's testimony regarding the phone's "unlocked" condition to have been proper. The district court pointed out it had sustained the objection to the testimony about the phone being rooted. The district court then instructed the jurors to disregard the testimony about the cell phone's "unusual characteristics," to cover Det. Price's reference to developer options. The district court did so because Kemp's lawyer was not given the opportunity to review that portion of Det. Price's report rather than because the testimony was itself especially prejudicial.

Given the limited testimony from Price about the cell phone and the technical nature of the problematic testimony, which was cut off before Price could explain it, the jurors almost certainly could not have been materially influenced. Moreover, we again

30

presume the jurors followed the instruction the district court gave them to disregard the testimony. The district court addressed the issue appropriately and acted well within its discretion to deny the motion for a mistrial.

*Newly Discovered Evidence*

On appeal, Kemp contends the district court erred in denying his motion for a new trial based on newly discovered evidence. Kemp premised the motion on two e-mails Wanda sent him in March 2016—after the jury had convicted him but before the district court had imposed sentence. The first e-mail was a caustic attack on Kemp for having sexually abused K.R. and deriding the notion she would not have stood up to him to protect her daughter. Wanda also expressed a certain satisfaction that Kemp would be severely punished for what he had done. The second e-mail, sent about three weeks later, took a much milder tone. Wanda told Kemp that she knew he loved their biological children, that she wanted him to continue to have a part in their lives, and that she would communicate with him about them.

Appellate review of a district court's ruling on a motion for new trial based on newly discovered evidence is for an abuse of discretion. As previously stated, judicial discretion may be abused in one of three ways:  the decision is based on an error of law, the factual premise for the decision is not supported by substantial competent evidence, or the decision is arbitrary, fanciful, or unreasonable. See *State v. Laurel*, 299 Kan. 668, 676, 325 P.3d 1154 (2014).

A district court considers two factors in determining if newly discovered evidence warrants a new trial. First, the district court asks whether the evidence could have been produced at trial if the defense had exercised reasonable diligence. Second, the evidence must be of such materiality that it would likely produce a different result in a retrial. 299

31

Kan. at 676. Appellate review of a district court's ruling on a motion for new trial based on newly discovered evidence is for an abuse of judicial discretion. 299 Kan. at 676.

The district court ruled against Kemp on the second factor. We follow that lead and assume the e-mails constitute newly discovered evidence, although they obviously were written after the trial and could not have been used as evidence then. Kemp tries to spin the e-mails into evidence supporting his theory that Wanda coaxed or coerced K.R. into making false accusations of sexual abuse against him to get even with him for his affairs with other women. But nothing in the e-mails directly or by reasonable inference supports that motive or otherwise suggests K.R. lied or Wanda believed she lied. In addition, as we have outlined, various circumstances tended to corroborate K.R.'s account of sexual abuse.

*Cumulative Error*

As his final point on appeal, Kemp argues that the cumulative impact of the errors deprived him of a fair trial. Appellate courts will weigh the collective impact of trial errors and may grant relief if the overall result deprives the defendant of a fair hearing even though the errors considered individually might be considered harmless. *State v. Smith-Parker*, 301 Kan. 132, 167-68, 340 P.3d 485 (2014). The overall effect of the errors is measured against the trial record as a whole. *State v. Holt*, 300 Kan. 985, 1007, 336 P.3d 312 (2014).

We have identified multiple errors in Kemp's trial. But each of them tended to be minor or peripheral to the main issue of whether Kemp sexually abused K.R. The issue turned on the credibility contest, played out from the witness stand for the jurors, between Kemp and K.R. As we have said, their appearances, comportment, and testimony were central to the outcome of this case. Even collectively, the trial errors would not have

32

reversed the course of that testimonial battle—a battle Kemp lost. We, therefore, reject Kemp's claim for reversal because of cumulative error.

The State has appealed the district court's posttrial ruling setting aside three of the four jury verdicts finding Kemp guilty of raping K.R. and ordering a new trial on those charges. The district court did so on the grounds the jurors may not have unanimously agreed on the specific acts supporting the charges.

K.R.'s account of the sexual abuse included descriptions of repeated acts by Kemp that would have constituted rape as defined in the Kansas Criminal Code. See K.S.A. 2016 Supp. 21-5503(a)(3) (rape includes "sexual intercourse" with a child younger than 14 years old); K.S.A. 2016 Supp. 21-5501(a) (defines "sexual intercourse" as "penetration of the female sex organ by a finger, the male sex organ or any object"). Those acts were more numerous than the four counts of rape with which Kemp was charged.

That circumstance creates what is commonly referred to as a "multiple acts" issue or problem. Kemp has a statutory right to a unanimous verdict on each rape charge, requiring the jurors to agree on the specific act supporting that charge. See K.S.A. 22-3421. Criminal defendants, however, do not have a state or federal constitutional right to a unanimous verdict in noncapital cases tried in state court. See *State v. Schreiner*, 46 Kan. App. 2d 778, 791, 264 P.3d 1033 (2011).

To insure juror unanimity, district courts typically either include a freestanding instruction informing the jurors they must unanimously agree on the specific act constituting the charged crime or incorporate unanimity language into another pertinent instruction. See *State v. Colston*, 290 Kan. 952, 961, 235 P.3d 1234 (2010) (use of jury

instruction); PIK Crim. 4th 68.100 (instruction on multiple acts and need for unanimity as to particular act). In the absence of a unanimity instruction, the State may "elect" in closing argument which criminal act described in the evidence corresponds to each of the charged counts by explicitly identifying for the jurors the act and associating it with a particular count. 290 Kan. at 961.

For purposes of appeal, both sides agree the rape counts presented a multiple acts issue. Kemp's trial lawyer asked the district court to include language in the jury instructions to address the issue. The prosecutor, however, wanted to deal with the multiple acts problem with an election in closing argument. The district court acceded to the prosecutor's request and declined to include a jury instruction on unanimity and multiple acts. Again, for purposes of appeal, both sides essentially agree the prosecutor failed to sufficiently elect or identify particular acts corresponding to three of the four rape counts.

Because jury unanimity entails a statutory right, a multiple acts error, such as the one here, does not automatically require a reversal of the convictions. In other words, the error may be harmless in a given case. *Colston*, 290 Kan. at 969. The test for harmlessness would be that outlined in *Ward* for nonconstitutional errors:  Is there "a reasonable probability that the error did . . . affect the outcome of the trial in light of the entire record." *Ward*, 292 Kan. 541, Syl. ¶ 6. As the party benefiting from the error, the State bears the burden of proving harmlessness. *State v. McCullough*, 293 Kan. 970, 983, 270 P.3d 1142 (2012).

In ruling on Kemp's posttrial motion, the district court correctly sized this up as a multiple acts case, as it had at the jury instruction conference, and correctly determined the prosecutor had failed to elect specific acts for the rape counts in closing argument. Without any detailed explanation, the district court found the error was not harmless. The district recognized the appropriate remedy would be a new trial on those counts and

entered an order to that effect. The State has timely appealed from the ruling. See K.S.A. 2016 Supp. 22-3602(b)(4). An appellate court reviews a ruling on a motion for a new trial for abuse of judicial discretion. See *Williams*, 303 Kan. at 595.

The district court erred in how it applied the test for harmlessness and, thus, stepped outside the governing legal framework—an emblem of abuse of discretion. To the extent the district court offered a basis for its determination on harmlessness, it simply stated that it would have "to speculate" that the jurors unanimously agreed on the particular acts in light of the number of rapes K.R. described in her testimony. But the test for harmlessness doesn't ask whether the jurors likely agreed on particular acts but whether the verdicts would have been different if they had been informed they needed to so agree. The difference may be subtle, but it is legally significant.

As we have said, given the evidence, the fundamental task for the jurors lay in resolving the credibility battle between Kemp and K.R. The verdicts demonstrate that the jurors found K.R. credible and Kemp not. They necessarily concluded that Kemp's version, including his denial of any abuse, didn't so much as raise a reasonable doubt about his guilt. That reflects a stinging rebuke of Kemp's veracity. In addition, as we have indicated, other evidence corroborated K.R. as the truth-teller. Her half-siblings described circumstances in the household and her interactions with Kemp that were consistent with the abuse she described, such as the two of them being together in the bedroom. And H.K.'s account of Kemp's abuse of her, which we have determined was properly admitted, weighed against his denial and, thus, effectively in favor of K.R.

Pertinent to this issue, the credibility determination shows the jurors believed K.R. and, thus, her version of the sexual abuse, including the multiple acts constituting rape. If the jurors were informed they had to agree on specific acts among those K.R. described to support the rape charges, we have no reason to think they would not have or could not have done so, since they otherwise appeared to accept the breadth of her testimony. Their

35

guilty verdicts on the other counts demonstrate as much. In short, nothing in the record suggests the jurors had some hesitancy or trepidation about K.R.'s credibility in whole or in part. In turn, we see no sound basis to say they would been unable to agree on specific acts supporting the three rape counts. In *Colston*, the court similarly recognized that the focal credibility contest between an accused sex abuser and his victim categorically resolved by the jury in favor of the victim rendered a dangling multiple acts issue harmless. 290 Kan. at 970. The same is true here.

The error in the district court's failure to instruct the jurors on unanimity and in the prosecutor's failure to sufficiently elect during closing argument did not deprive Kemp of a fair trial, since every indicator shows the jurors would have come to the same result on those rape charges absent the error. That renders the error harmless and the verdicts legally sufficient. We, therefore, reverse the district court's ruling setting aside the three verdicts of guilty on the rape charges and remand with directions to the district court to reinstate those verdicts and to sentence Kemp on them.

CONCLUSION

On Kemp's appeal, we find no reversible error and affirm the guilty verdicts and the journal entry of judgment the district court entered.

On the State's appeal, we find the district court erroneously set aside the guilty verdicts on the three counts of rape. We reverse the district court's ruling. The case is remanded to the district court to reinstate those verdicts and to sentence Kemp accordingly.

Affirmed in part, reversed in part, and remanded with directions.

36

BUSER, J., concurring:  I concur with this result but write separately because I disagree with some of my colleagues' findings of error and I believe that some explanation is in order with regard to the analysis.

First, with regard to Shaun Price's expert testimony about the Pro PC Cleaner program found on Hershel A. Kemp's computer, Price testified that he lacked any personal knowledge of this program. However, Price testified that he discussed the program with other investigators on the IACIS (International Association of Criminal Investigative Specialists) listserv. According to Price, experts in his field generally rely upon this association for information regarding unfamiliar computer programs.

Based on Kemp's knowledge obtained from this professional resource, I would find the district court appropriately permitted Price to testify generally that Pro PC Cleaner was a program designed to wipe data from the computer, even if Price could not offer an expert opinion regarding the type of data the program overwrote or how the software program functioned. See *United States v. Garcia*, 793 F.3d 1194, 1212 (10th Cir. 2015) ("'As long as [an expert] is applying his training and experience to the sources before him and reaching an independent judgment, there will typically be no *Crawford* [*v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004)] problem. The expert's opinion will be an original product that can be tested through cross-examination.'" [quoting *United States v. Johnson*, 587 F.3d 625, 635 (4th Cir. 2009)]).

Contrary to my colleagues' finding, I believe Price was sufficiently qualified from his experience as a forensic computer investigator to render an expert opinion about the purpose and general workings of computer cleaning programs, like Pro PC Cleaner.

Second, while I agree that the probative value of the K.S.A. 2016 Supp. 60-455(d) evidence outweighed any prejudice to Kemp, I disagree that "[t]he balancing in this case may have been closer than in many," slip op. at 20 because H.K. personally testified to her prior sexual abuse at the hands of Kemp, without proof of a criminal conviction as a result of that abuse. In this regard, my colleagues reason, "unfair prejudice arguably could arise because of the uncertainty surrounding H.K.'s accusations against Kemp." Slip op. at 20.

At the outset, I know of no Kansas precedent supporting this notion. And, as the majority points out elsewhere in their opinion:

> "'The judicial process treats an appearance on the witness stand, with the taking of an oath and the rigor of cross-examination, as perhaps the most discerning crucible for separating honesty and accuracy from mendacity and misstatement.' *State v. Bellinger*, 47 Kan. App. 2d 776, 787, 278 P.3d 975 (2012), *rev. denied* 298 Kan. 1204 (2013) (Atcheson, J., dissenting). The ability of the jurors to observe witnesses as they testify is integral to that evaluation. *State v. Scaife*, 286 Kan. 614, 624, 186 P.3d 755 (2008)." Slip op. at 13-14.

By H.K. appearing personally at trial and submitting to cross-examination by the defense, Kemp was afforded the valuable opportunity to fully and fairly challenge H.K.'s credibility and dispute her account of Kemp's prior abuse. In this way, H.K.'s personal appearance in the courtroom lessened, not increased the potential for unfair prejudice against Kemp.

Third, for purposes of our panel's analysis of whether it was reversible error to allow Detective David Holmes to testify to the detailed account K.R. provided during a pretrial interview, we *assume* for purposes of resolving this issue that the detective's testimony was improperly cumulative before finding it was harmless error. In order that this assumption is not misconstrued, however, it is appropriate to cite *State v. Kackley*, 32

Kan. App. 2d 927, Syl. ¶ 6, 92 P.3d 1128 (2004): "[A]dmission of repetitious testimony regarding the victim's report of the incident prior to admission of the victim's testimony was not an abuse of discretion because such evidence may be permitted in child sex crimes [cases] to corroborate the child's testimony." See slip op. at 21-22.

Fourth, on appeal, Kemp asserts that the prosecutor improperly bolstered H.K.'s credibility by mentioning that she came forward voluntarily to testify at the trial. The prosecutor told the jurors the State had no "magic" to secure H.K.'s testimony. My colleagues find that the prosecutor erred by mischaracterizing the law because the State conceivably could have subpoenaed H.K. to testify at trial.

Preliminarily, on appeal, Kemp does not argue that the prosecutor mischaracterized the law. He also does not complain that the prosecutor failed to inform the jury that H.K. could have been subpoenaed for trial. Since Kemp did not make or brief these arguments, I believe our court should avoid basing our ruling on those grounds. Kemp's claim is simply that the State improperly bolstered H.K.'s testimony by suggesting that H.K. did not have a motive to lie about her allegations.

In support of his argument that these statements were improper, Kemp cites *State v. Sprague*, 303 Kan. 418, 428, 362 P.3d 828 (2015), and *State v. Donaldson*, 279 Kan. 694, 708, 112 P.3d 99 (2005). Both cases are distinguishable from the present case. In *Sprague* and *Donaldson*, the prosecutor went beyond discussion of a prosecution's lack of motive for fabricating testimony to interject the prosecutor's personal belief about the witness' motive for testifying. The *Sprague* court noted that a prosecutor's comment on "what [the jury] should look for in assessing witness credibility" fell within the wide latitude permitted prosecutors to present the State's case. 303 Kan. at 428-29 (quoting *State v. McReynolds*, 288 Kan. 318, 325, 202 P.3d 658 [2009]). And, contrary to Kemp's reading of the opinion, the *Sprague* court did not find prosecutorial error for improper

witness-bolstering but for the prosecutor's injection of personal opinion and commenting on facts outside the evidence. 303 Kan. at 429.

In the State's closing argument, the prosecutor did not impermissibly offer his personal opinions about the credibility of H.K. or argue facts outside the evidence. Instead, the prosecutor permissibly argued reasonable inferences drawn from the circumstances of the case to ask the jury to consider H.K.'s lack of motive to testify falsely against Kemp. This was permissible argument. See *State v. King*, 288 Kan. 333, 353, 204 P.3d 585 (2009) ("It was not improper for the prosecutor to argue that L.E. did not have a motive to be untruthful—this statement does not constitute vouching for the witness' credibility.").

Finally, during the majority's discussion of the prosecutor's alleged error in asking Kemp what motive H.K. had to accuse him of sexually molesting her years earlier in Detroit, the opinion discusses a hypothetical "extraordinarily rare scenario" wherein a complaining victim was "sufficiently delusional to have imagined the episodes or confused benign conduct with sexual abuse." Slip op. at 16. Since this scenario was not presented in this case and was not briefed or argued by the parties, I believe this analysis is dicta, and it would be better addressed if and when such an actual scenario presents itself in some future appeal.

I concur in the judgment.

40